No. 3519

Second Circuit

DENNIS v. SHREVEPORT CREOSOTING CO.

(July 1, 1929. Opinion and Decree.)

Morgan & Naff, of Shreveport, attorneys for plaintiff, appellee.

Thatcher, Browne, Porteous & Myers, of Shreveport, attorneys for defendant, appellant.

REYNOLDS, J. Plaintiff sues under the Workmen's Compensation Act for $20 a week during disability, not exceeding 400 weeks, and for $250 for medical treatment. He alleges that on May 18, 1928, he was employed by defendant and in the course of his employment was assisting fellow workmen in carrying a heavy steel truss and his foot slipped and his back was jerked and wrenched, causing traumatic arthritis of the lower lumbar spine and right sacroiliac joint coupled with a rotary lateral displacement of the fifth lumbar vertebra and permanently totally disabling him to do work of any reasonable character. He further alleges that he was earning $6 a day and working seven days in the week.

Defendant admitted that plaintiff complained of his back being strained and avers that it sent him to its physician for treatment and that he was treated by the physician and discharged as cured and capable of doing any work of a reasonable character.

It further avers that if plaintiff's back was injured he entirely recovered from the injury within three weeks thereafter and was again able to do and did do manual labor as well as before the injury.

In the alternative, and only in the alternative, it further alleged that if plaintiff was still disabled it was not at all owing to the accident but solely to an old and chronic condition of diseased

tonsils and teeth from which plaintiff was suffering at the time of the accident and long prior thereto.

On these issues the case was tried and there was judgment in favor of the plaintiff and against the defendant for $20 per week during disability, not exceeding 400 weeks, the first payment being decreed due as of May 25, 1928, with legal interest on each payment from its maturity until paid, and costs of suit.

From this judgment the defendant appealed.

### OPINION

Only questions of fact are presented for our determination, namely: whether plaintiff is disabled, as claimed, and, if so, whether the disability was caused by the injury sustained on May 18, 1928.

Doctor Guy A. Caldwell made a physical examination of plaintiff and reported, his report being dated August 23, 1928.

"Five days ago, had tonsils removed. Teeth x-rayed August 17th, and found to be negative. Several years ago patient was working on some steel construction work and a chip of steel flew off and entered the neck where it became embedded. It was x-rayed and examined by various physicians who decided that it would be unwise to attempt to remove it, as it lay against the trachea and alongside important nerves and blood vessels in the neck. Patient says that it continues to give him trouble, causing pain and drawing in the neck, some difficulty in swallowing and on certain movements of the neck. Patient walks without assistance, without noticeable effort to protect the back. There is no lateral deformity of the spine, but there is a prominence of the muscles in the back, more marked on the right side. Shoulders are somewhat rounded, and the lumbar region somewhat flattened. Forward bending is accompanied by limited motion in the lumbar spine, with definite muscle spasm of the right lumbar groups. There is an acute tenderness over the fifth lumbar spine and the lumbo-sacral ligament on the right side, and some tenderness on the left, just below the costovertebral angle. Rising on the toes and dropping on the heels produces intense muscular spasm and sickening pain, so that the patient was forced to lie down for some minutes. The muscles are relaxed, and the tenderness is not so great over the fifth lumbar spine where it is quite marked. All hip movements are free and well performed. There is no tenderness over the sciatic nerve or its distribution. X-ray examination of the pelvis shows no injury to the hip joint or the ilium. On the right side, the lower portion of the sacroiliac joint shows an area of absorption and roughening together with an effort at none proliferation in the iliac portion. Antero-posterior view of the lumbar spine, shows distortion of the fifth lumbar vertebra and its articulation with the sacrum. On the right side, the transverse articulation is in approximately the normal position and relation, but on the left side it is considerably lower and distorted. The left articulation and the lamina, are very much larger, thicker, broader than the right. The transverse process on the right apparently impinges against the sacrum. The lumbar vertebrae otherwise appear normal and show no distortion or disease. Lateral plates of the lumbar spine show no definite displacement or disease.

"X-Ray Diagnosis.

"1. Traumatic arthritis of the right sacroiliac joint.

"2. Rotary lateral displacement of the fifth lumbar vertebra.

"X-Ray of the Neck.

"X-ray of the neck shows the presence of a foreign body in the tissues to the left side of the middle and deeply seated alongside the vertebral column. This foreign body is about 1 inch long by 1-16 inch thick and of the consistency and density of steel.

"Diagnosis.

"Foreign body (probably a piece of steel) embedded in the tissues of the neck near the spinal column.

"Clinical Diagnosis.

"1. Arthritis of the lower lumbar spine and right sacroiliac joint, post-traumatic.

"2. Rotary lateral displacement of the fifth lumbar vertebra.

"Opinion.

"Patient's present condition is one of total disability for manual labor. This is due to an injury of the sacroiliac joint and fifth lumbar vertebra. There is no evidence of chronic arthritis nor other diseases which might produce the symptoms complained of. Jarring the spine and bending movements of the spine produce pain and muscle spasm which is incompatible with manual labor."

Doctor E. L. Sanderson testified that he made a physical examination of the plaintiff on September 15, 1928, aided by x-ray plates, and that:

"Q. Doctor, do you know the plaintiff in this case, Robert C. Dennis?
"A. Yes, I do.
"Q. Did you have occasion to examine him lately?
"A. Yes; I examined him on September 15th.

* * * * * *

"Q. Just tell the court what your findings were at that time, and just what was done by you in order to make a thorough examination?
"A. On September 15, 1928, or thereabouts, I examined Mr. Dennis. He gave his age as 43 years. He was supposed to have been injured while in the employ of the Shreveport Creosoting Company, and at the time of this examination—I saw him on several occasions, but at the time of this examination his chief complaints were that his back feels sluggish and that when he strikes his foot against any object or upon getting up he hurts all over. He said he became nervous at times and that it hurts his back to lie in bed and that his left leg becomes tired easily. On physical examination I found

that he is sixty-six inches tall, weight 180 pounds. He is well nourished, has a florid complexion, that is, a ruddy complexion; has no swellings or glandular enlargements. His sight is good; his hearing is good. Upon examination of his throat I find that his tonsils have been removed. His gums show to be diseased, and his heart is slightly accelerated, that is, a little bit faster than usual but otherwise normal. His lungs are normal. His prostrate gland is slightly enlarged. His back shows nothing on inspection. His spine is reasonably flexible, but he complains on bending. And those are my physical findings.

"Q. What condition did you find there with the back, doctor, with reference to his ability to use his back for ordinary work?
"A. Well, his back is flexible in all directions. You see, a person's spine, the only examination you can make of the spine when a person complains of it is as regards its flexibility.

"Q. What does that indicate?
"A. When it is flexible, you cannot reasonably suppose that there is any disease or injury of any consequence.

"Q. Now, it has been testified here by Doctor Caldwell, that he found muscle spasms when Mr. Dennis would drop down from his toes on his heels. What would you say as to that, doctor, as to that condition?
"A. Well, a great many people, on dropping from their toes to their heels, will have a crick in the muscles of the back. I expect, if you will do so yourself, you will find that to be the case, because when you do that the muscles of the back are the muscles that keep you in balance; they are the balancing muscles when you stand erect; and if you drop on your heels, there would probably be some you might say wavey motion, of the muscles adjusting themselves. But we did not notice any muscle spasm.

"Q. Did you find any condition there that would indicate that he had a permanent or even temporary injury at the time, of his sacroiliac joint, doctor?
"A. There is no external evidence of it.

"Q. Did you have Doctor Adair to make x-ray pictures of this man?

"A. We did.

"Q. Did you examine his reports?

"A. We did.

"Q. Now, taking your physical findings with his, what would you say as to this man's disability to do work at the time of the examination?

"A. Well, there is nothing in the physical examination, or in the x-ray examination, to indicate disability.

* * * * * *

"Q. You have already testified that you had the report of Doctor Adair, and you have shown there that Mr. Dennis has arthritis in the fifth lumbar vertebra and in the twelfth dorsal vertebra; is that correct?

* * * * * *

"A. Well, just summing up his statement, there is what is called lipping of the vertebrae. That is a little spur formation that forms at the edges of the vertebrae, which shows arthritis.

"Q. What would you say was the cause of that arthritis, doctor?

"A. In my opinion, arthritis in this part of the body, as well as in most every other part of the body, is due to infection.

"Q. Do you know anything about Mr. Dennis' history as to any infection or other troubles he has had?

"A. I know he had bad infection in his mouth?

"Q. You say mouth; do you refer to the tonsils?

"A. The gums.

"Q: Did he have infected tonsils, so far as you know?

"A. His tonsils had been removed.

* * * * * *

"Q. Doctor, you testified as a witness in the case of this same plaintiff against the Fortuna Oil Company. If I show you where you testified in that case, in order to refresh your memory, as to his giving infected tonsils, would you remember it?

* * * * * *

"A. I remember now, since my mind has been refreshed, as to my testimony in that case.

* * * * * *

"Q. Do you remember examining Mr. Dennis and finding that he had infection of his tonsils?

"A. Yes; he had bad tonsils.

* * * * * *

"Q. Did you have this plaintiff to undergo certain physical movements and muscular movements which would, if he really had the complaint, indicate that complaint at the time?

"A. Yes; we put him through the tests that would have brought out any serious physical defects that he would have in the region of the spine.

* * * * * *

"Q. Doctor Scales has testified, from x-ray plates, this morning, that this man had no pus pockets in his teeth.

"A. You mean around the teeth, or the roots of the teeth?

"Q. In his mouth. Now I want to know if your examination showed that he did have any.

"A. It did; and I think I can demonstrate to the court that he has infection around his teeth.

"Q. Let us see you do that?

"A. All right. Come around here. (Here the plaintiff presented himself for demonstration purposes.) Now, let us see. (Plaintiff's mouth is held open, and the witness uses the end of a penholder for designation purposes.) You take this tooth right here, you can see the pus coming up when you massage it. Here is the pus coming up around that tooth. His teeth are all infected there. Here is an infected tooth; see the pus coming out from behind that gum? (Witness referring to teeth in lower jaw.) See the pus coming out from above that gold tooth there? See the pus right above the gold tooth? There is very distinct infection in this tooth here (lower tooth). See the pus coming from it? Now here is the way they should appear; here is a good, healthy gum, this tooth right here. All of these gums are badly infected, above and below. He has one bad one here, where the gum has retracted, this bad gum here. This one is bad."

The x-ray plates taken by radiologist M. L. Adair and his testimony, are in accord with and support the testimony of Doctor Sanderson.

The opinions of Doctors Caldwell and Sanderson, both eminent physicians and surgeons, as to whether plaintiff is seriously disabled and, if so, the cause of the disability, differ very widely, but both witnesses agree that at the time of the trial plaintiff had a severe malady in his back.

Doctor Sanderson gives it as his opinion that the malady was caused by infection of plaintiff's gums and teeth.

Doctor Caldwell is of opinion that it is the result of the wrench or sprain in plaintiff's back.

The trial judge accepted the opinion of Doctor Caldwell in preference to that of Doctor Sanderson, and that opinion is supported by the testimony of Doctors John L. Scales, Sr., and John L. Scales, Jr., both of whom gave it as their opinion that the condition of plaintiff's teeth and gums could not have caused the trouble in his back.

Doctor Scales, Jr., testified:

"Q. Have you examined the plaintiff in this case, Mr. Dennis?
"A. I have.
 *   *   *   *   *   *

"Q. You made an examination with reference to his teeth and gums, did you not?
"A. I did.
"Q. What did you find?
"A. I found a gold crown on the upper central and lateral and also the right cuspid. Inlays on the lower left lateral and cuspid. Some evidence of gingivitis and that did not indicate the condition of the gums and teeth. Some evidence of what is commonly known as pyorrhea in the lower molar and bicuspid region, especially of the upper left molar and second bicuspid region. The teeth were sound; no loose teeth; no cavities; no devitalized or so-called dead teeth—that is, teeth that had the nerves removed and the root canals filled. In my estimation—

"Q. Did you take x-ray pictures of them?
"A. I did.
"Q. What did it show?
"A. I took twelve exposure pictures. These pictures showed just what I have given from my readings—that the teeth apparently are situated in sound bone. That is, the bone around the teeth is not destroyed by infection enough to cause the teeth to be loose or to harbor what we commonly call pus pockets to such an extent as to give rise to this arthritis. Of course that is my estimation.
 *   *   *   *   *   *

"Q. How many pus pockets did you find in Mr. Dennis' mouth?
"A. I did not find any marked pus pockets at all.
"Q. Did you find any pus pocket that would cause you to believe that it was feeding pus into his system that would affect his bones or joints?
"A. I did not.
 *   *   *   *   *   *

"Q. You are assuming he hasn't got a rheumatic condition?
"A. I examined the patient, knowing that he was suffering from arthritis, and, with that in mind, trying to see if his teeth were the cause, and if so, I planned to remove the teeth.
 *   *   *   *   *   *

"Q. You did not find any teeth that were dead, at all?
"A. No, sir.
"Q. You did find, though, that there was infection there in the gums, as you say?
"A. Yes.
"Q. And you found some evidence of pyorrhea?
"A. Slight, yes."

Doctor Scales, Sr., testified:

"Q. Doctor Scales, have you had occasion to examine this man Dennis, right there before you?
"A. Yes.

"Q. About what time?

"A. August, I think.

"Q. Did you remove his tonsils?

"A. I did.

"Q. Just explain to the court what condition you found them in?

"A. Well, I found his tonsils enlarged, not particularly bad, I thought.

\* \* \* \* \* \*

"Q. You took them out at his request, did you not?

"A. I took them out at his request; yes.

"Q. He believed their removal would do him good?

"A. Well, he hoped so, like I did.

"Q. Did you believe these tonsils were bad enough to produce focal infection, such as to produce arthritic back?

"A. I thought it very doubtful.

\* \* \* \* \* \*

"Q. Will you tell us what your opinion is?

"A. I can tell you what it was at the time of the operation, if you want me to tell you?

"Q. All right; let's have it.

"A. My opinion was, then, that his tonsils probably did not cause his trouble, but that they might, and the man was disabled, and I wanted to give him the benefit of the doubt, and so I removed his tonsils."

We think the testimony of Drs. Scales, Jr., and Scales, Sr., goes far toward destroying the theory that the cause of plaintiff's trouble was infected gums and teeth.

And the theory that the trouble to plaintiff's back resulted from some cause antedating the alleged wrenching or spraining of it on May 18, 1928, is inconsistent with the fact that prior to the wrenching or spraining plaintiff was able to do and did the hardest kind of steel structural work and the fact that at the time of the wrenching or spraining he was helping to move a steel truss weighing more than a ton.

Defendant earnestly insists that plaintiff is a malingerer, and points to the fact that in a suit against the Fortuna Oil Company, a former employer, he had alleged that he was permanently totally disabled and sought compensation on that basis, and that after the alleged wrenching or spraining of his back he had continued to perform hard manual labor.

The fact that plaintiff sought and failed to obtain compensation as for permanent total disability in a suit against a former employer is no bar to the right to recover in the present action if, under the law and the evidence, he is entitled to do so. The basis of the other suit is a circumstance in support of defendant's contention that the cause of plaintiff's incapacity antedates the wrenching or spraining of his back on May 18, 1928.

And as to the continued performance by plaintiff of hard manual labor, the evidence fails to establish this. R. B. Collins testified that he knew plaintiff; that he was engaged in the business of operating a "filling station" in that part of the city of Shreveport formerly called Cedar Grove

and that the only manual work he had seen plaintiff do was when he was having a bridge repaired near his place of business by a negro and that the negro did not know how to do the work and that plaintiff came along at the time and that at his request plaintiff helped the negro on the job.

"Q. Did he help the negro do the work?
"A. Him and the negro built the bridge for me.
"Q. What kind of timbers were in that bridge, Mr. Collins?
"A. The material that I made the bridge out of was 2x10's, 20 feet long; then we had sleepers 6x8, 5 feet long.
"Q. How long did it take Mr. Dennis and this colored man to do this work?
"A. They started about 1:30 and were through at 5:00."

On cross-examination he testified:

"Q. You did not see him (plaintiff) doing any actually hard work, did you?
"A. No, I wouldn't—I could not say that I seen him doing anything."

As stated at the outset, the case involves solely questions of fact. The trial judge who saw and heard the witnesses testify resolved these issues in favor of the plaintiff. Judgments based upon issues of fact will not be disturbed on appeal unless clearly erroneous. La. Dig. Verbo Appeal, sec. 625, page 591.

After carefully reading the record we are unable to say that the judgment appealed from is erroneous, and accordingly it is affirmed.